FILED

MAR 1 6 2006

CLERK U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY           Deputy Clerk

1  MICHAEL L. TUCHIN (State Bar No. 150375)
   LAURA L. BUCHANAN (State Bar No. 156261)
2  MARTIN R. BARASH (State Bar No. 162314)
   KLEE, TUCHIN, BOGDANOFF & STERN LLP
3  2121 Avenue of the Stars, 33rd Floor
   Los Angeles, California 90067-5061
4  Telephone:  (310) 407-4000
   Facsimile:  (310) 407-9090

5  Proposed Reorganization Counsel for
   Debtors and Debtors In Possession

6  Debtors' Mailing Address
7  9939 Norwalk Blvd.
   Santa Fe Springs, CA 90670

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| In re | Case No(s).: LA 06-10875-EC |
| APX HOLDINGS, L.L.C.<br>APX LOGISTICS, INC.<br>APX EXPRESS, INC.<br>APX CENTRAL, INC.<br>CTC DIRECT, INC.<br>PARCEL SHIPPERS EXPRESS, INC.<br>VA PARCEL, L.L.C.<br>TEX-PACK, INC.<br>TEX-PACK EXPRESS, L.P.,<br><br>Debtors. | Chapter 11<br><br>**EMERGENCY MOTION PURSUANT TO GENERAL ORDER 02-02 FOR ORDER AUTHORIZING DEBTORS AND DEBTORS IN POSSESSION TO HONOR AND PAY COSTS ASSOCIATED WITH: (1) PREPETITION EMPLOYEE COMPENSATION AND (2) EMPLOYEE BENEFITS AND BENEFIT PROGRAMS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>**Hearing**<br>Date: TBD<br>Time: TBD<br>Place: Courtroom<br>Roybal Federal Building<br>255 East Temple Street<br>Los Angeles, CA 90012 |

83925.1

# **TABLE OF CONTENTS**

MOTION ........................................................................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES..................................................3

I. BACKGROUND FACTS ...........................................................................................3

    A.    General Background.......................................................................................3

    B.    Employee Wages, Salaries, Commissions and Other Compensation. ...............4

        1.    Full and Part Time Employee Wages and Salaries. ...........................4

        2.    Interim Employee Compensation........................................................5

        3.    Service Partner Compensation. ..........................................................6

    C.    Business Expense Reimbursements. ...............................................................6

    D.    Employee Benefits. ........................................................................................7

        1.    Health Insurance.................................................................................7

        2.    Dental Insurance.................................................................................8

        3.    Vacation Pay. .....................................................................................8

        4.    Workers' Compensation. ....................................................................9

        5.    Life Insurance/Disability/Employee Assistance. ................................9

        6.    401(k) Plan. .......................................................................................9

        7.    Flexible Benefits Plan. .....................................................................10

        8.    Terminated ESOP............................................................................11

        9.    Other Benefits. .................................................................................11

    E.    The Need For Immediate Relief. ..................................................................11

II. ARGUMENT............................................................................................................12

    A.    Maintaining Wages Is Critical to the Success of The Debtors' Chapter 11 Case. ..............................................................................................................12

    B.    Maintaining the Employee Benefit Programs Is in the Ordinary Course of The Debtors' Business. .........................................................................................13

    C.    Employee Compensation and Benefits Are A Cost of Winding Down The Debtors' Business Operations Postpetition..................................................14

    D.    Bankruptcy Section 507(a)(3) Grants Employees a Priority for Prepetition

KLEE, TUCHIN, BOGDANOFF & STERN LLP
2121 AVENUE OF THE STARS, 33RD FLOOR
LOS ANGELES, CALIFORNIA 90067-5061
TELEPHONE: (310) 407-4000

   Wages. ...................................................................................................................16

III. CONCLUSION ...............................................................................................................17

KLEE, TUCHIN, BOGDANOFF & STERN LLP
2121 AVENUE OF THE STARS, 33RD FLOOR
LOS ANGELES, CALIFORNIA 90067-5061
TELEPHONE: (310) 407-4000

83925.1

**TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE, THE DEBTORS' FORTY LARGEST UNSECURED CREDITORS, THE DEBTORS' SECURED CREDITORS AND OTHER PARTIES IN INTEREST:**

APX Holdings, L.L.C., APX Logistics, Inc., APX Express, Inc., APX Central, Inc,. CTC Direct, Inc., Parcel Shippers Express, Inc., VA Parcel, L.L.C., Tex-Pack, Inc., Tex-Pack Express, L.P., debtors and debtors in possession ("Debtors" or the "Company") hereby move this Court on an emergency basis, pursuant to General Order 02-02 for entry of an Order authorizing the Debtors, in their sole discretion and as a matter of their business judgment to: (1) pay the outstanding wages, salaries and other compensation (including related taxes) to their employees, interim employees and service partners, (2) honor and pay business expense reimbursement requests, and (3) honor, continue and pay the obligations associated with its employee benefit programs and policies (including obligations outstanding as of the commencement of the case), to the extent necessary to ensure the provision of postpetition benefits to employees – all as more specifically described in the annexed Memorandum of Points and Authorities. The Debtors respectfully submit that this relief is reasonable and necessary to enable the Debtors to continue operations as they conduct an orderly wind-down of their business and an orderly liquidation of their assets for the benefit of economic stakeholders.

1

This Motion is supported by the Declaration of Bradley S. Garberich in Support of Emergency First Day Motions ("Garberich Declaration") that has been filed concurrently with this Motion, and any other evidence presented prior to or at the hearing on this Motion.

DATED: March 16, 2006

MICHAEL L. TUCHIN
LAURA L. BUCHANAN
MARTIN R. BARASH
KLEE, TUCHIN, BOGDANOFF & STERN LLP
Proposed Reorganization Counsel for
Debtors and Debtors in Possession

83925.1

2

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## BACKGROUND FACTS

**A.    General Background.**

The Debtors commenced these cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors have filed these cases in order to conduct an orderly liquidation of their assets and to maximize the value of those assets for the benefit of the economic stakeholders of their estates.

Prior to the commencement of these cases ("Petition Date"), the Debtors were providers of small parcel and freight delivery services to high volume commercial customers, including retailers, e-tailers, catalog and mail order companies, television shopping channels, consumer product companies, and infomercial sellers. The Debtors' are headquartered in Santa Fe Springs, California. All of the Debtors' real property is leased, including approximately 52 freight terminals utilized prior to the Petition Date.

Prior to the Petition Date, the Debtors provided sorting and shipping services to their customers utilizing a combination of: (i) approximately 1,600 full and part-time employees, (ii) approximately 3,000 temporary employees provided by third-party providers, (iii) approximately 390 independent truckers ("Service Partners") (in some cases, using trucks owned by the Debtors), (iv) a number of large package delivery carriers (such as DHL), and (v) the United States Postal Service, which in most cases provided the "last mile" of delivery to consumers.

Shortly before the Petition Date, the Debtors ceased accepting packages not already in transit from all but one of their customers and laid off approximately 60 employees. The Debtors intend to conduct an orderly wind-down in chapter 11 (albeit with a smaller workforce) to ensure that as many as possible of the packages that the Debtors previously accepted for delivery from their customers are timely delivered to their intended recipients, and that the Debtors' collection of their accounts receivable are maximized.

For approximately one month following the Petition Date, the Debtors intend to

83925.1

3

continue limited operations for the sole purpose of serving one of their customers: the United States Government on behalf of the Veterans Administration ("VA"). Pursuant to a federal contract ("VA Contract") among the VA, CTC Direct, Inc., and its non-debtor parent CTC Holdings I, Inc., the Debtors ship prescription medication to patients of the VA nationwide under the VA's prescription medication program.

The Debtors receive from the VA approximately 1 million packages each day for shipping to VA patients. While the Debtors recognize that they must wind down their operations, the Debtors also recognize the importance of preventing an interruption in the delivery of prescription medications to VA patients. Immediately prior to the Petition Date, the Debtors provided the VA with 30 days' notice of their intent to terminate services under the VA Contract (as permitted by the VA Contract), but intend to continue serving the VA during that period (unless alternative arrangements can be made with the VA earlier).

Systemwide, there presently are approximately 2.7 million parcels from all of the Debtors' customers either at the Debtors' facilities, in transit on the Debtors' own vehicles, in transit with third party providers, or on the final leg of their journey to their intended recipients with the USPS. Prior to the Petition Date, the Debtors negotiated with their prepetition lender, Bank of America, and agreed to a wind-down budget and a debtor in possession facility that is intended to permit the Debtors to continue servicing the VA as set forth above and attempt to clear all packages out of the Debtors' system.

**B.     Employee Wages, Salaries, Commissions and Other Compensation.**

The Debtors seek authority, in their discretion and the exercise of their business judgment, to pay outstanding wage, salary, and other compensation obligations to their full and part-time employees, interim employees, and service partners (i.e., independent truckers and small trucking firms).

**1.     Full and Part Time Employee Wages and Salaries.**

The Debtors normally pay their full and part-time employees on a biweekly basis, one week in arrears. The Debtors' employees are divided between two payroll cycles, pursuant to which payroll is distributed to roughly one-half of the Debtors' employees on alternating

weeks. Accordingly, at any given time, the Debtors owe outstanding payroll obligations to their employees. The last payroll (covering roughly half of the Debtors' employees) was made on or about March 10, 2006. The next payroll (covering roughly the other half of the Debtors' employees) was processed and distributed on March 16, 2006 (including final payments to terminated employees), shortly before the filing of the Debtors' cases.

The Debtors' payroll generally is handled by a third-party payroll service, ADP. Typically, on Wednesday and Thursday of each week, ADP initiates ACH wire transfers against the Debtors' operating account to fund the upcoming Friday payroll and related payroll taxes. ADP then issues checks to employees (or facilitates direct deposits) against a bank account that is held and maintained in the name of ADP.

In addition, from time to time, the Debtors issue manually cut payroll checks from one of approximately six (6) manual payroll accounts, depending upon the employer entity ("Manual Payroll Accounts").

As of the Petition Date, the Debtors owed in the aggregate approximately $886,000 in prepetition wages and salary that had accrued in favor of employees, as well as applicable employer payroll taxes. As of the Petition Date, to the best of the Debtors' knowledge, no employee was owed more than $10,000 in wages or salary. In addition, as of the Petition Date, the Debtors were liable to employees for approximately $25,514 in wage and salary checks that had been written on the Manual Payroll Accounts but were outstanding and had not yet been presented for payment. (None of these checks exceeded $10,000).

### 2. Interim Employee Compensation.

In addition to the Debtors' regular full and part-time employees, the Debtors rely on approximately six (6) "interim employees." These are skilled workers who provide services in the Debtors' accounting department and other financial departments. These workers provide services to the Debtors as independent contractors and are not entitled to vacation or other employee benefits. All have direct contractual relationships with the Debtors. As of the Petition Date, the Debtors owed an aggregate amount of $35,000 in respect of prepetition services provided by their interim employees.

### 3. Service Partner Compensation.

Finally, the Debtors also rely on approximately 390 independent service partners ("Service Partners"), which are comprised of individuals, sole proprietorships, and other small trucking outfits that form a critical part of the Debtors' transport network. These Service Partners generally are paid on a weekly basis, on a rolling schedule throughout the week. Service Partners' compensation is handled for the Debtors by ADP, but checks are drawn on one of the Debtors' accounts. As of the Petition Date, approximately $2,400,000 was owed to Service Partners in respect of their prepetition labor, including both accrued and unpaid compensation, and an estimate of Service Partner checks that had been issued but still were "in the float" as of the Petition Date. The Debtors seek authority to pay outstanding prepetition amounts to Service Partners, up to, but not exceeding $10,000 per Service Partner.

### C. Business Expense Reimbursements.

The Debtors seek authority, in their discretion and the exercise of their business judgment, to pay employee business expense reimbursement requests for amounts incurred by employees prepetition. All expenses incurred by employees for business purposes are routinely reimbursed by the Debtors, including costs incurred for meals, travel, tolls, business phone calls, and the like. Before the Debtors commenced this case, many of their employees had incurred various business expenses that, consistent with ordinary practice, would be reimbursable by the Debtors.

Employees generally must submit expense reports in order to receive reimbursement for their business expenses, to which they must attach receipts or other backup documentation. After receiving any required approvals, employees then forward the expense reports to the accounts payable department, which generally remits payment on the next check run. Expenses generally are reimbursed promptly. It is very common, however, for employees not to submit their reimbursement requests for months after the expense has been incurred. In many cases employees have charged expenses on their personal credit cards,

6

83925.1

and do not submit a reimbursement request until some time after they receive their credit card billing statement.

As of the Petition Date, the Debtors' employees may have incurred up to $500,000 in reimbursable expenses that either have not yet been presented to the Debtors for payment, have been presented but have not been processed, or have been processed and paid by check, but the checks have not yet been presented for payment. This is only an estimate. The actual amount of outstanding reimbursable expenses as to which requests are properly made and substantiated ultimately may be less – and ultimately will not be determined until they are presented for payment.

### D.    Employee Benefits.

The Debtors maintain several benefit programs for their employees. Because many claims or other obligations have not yet been reported, the Debtors believe that it would be virtually impossible for them to calculate the exact benefits accrued by each employee during the prepetition period and to identify and treat separately the prepetition and postpetition claims arising under the benefit programs. Furthermore, in some cases those claims and obligations are against third parties, such as insurance carriers.

The Debtors seek authority, and in the exercise of their business judgment, to pay the costs of maintaining these benefits postpetition, including satisfying any prepetition obligations to the extent necessary to maintain these benefits.

### 1.    Health Insurance.

The Debtors provide health care coverage to their full time employees through insurance programs provided by Aetna and Blue Cross/Blue Shield of Minnesota. Under these programs, Aetna and Blue Cross/Blue Shield of Minnesota bear the responsibility of providing services to enrolled employees; the Debtors are not self-insured.

The premiums under the Aetna program are approximately $187,000 per month. As of the Petition Date, the Debtors were in arrears to Aetna in the approximate amount of $467,500. Approximately 356 employees are covered by the Aetna Plan. The Debtors are

only seeking authority to pay these premiums to the extent necessary to ensure health care benefits for the Debtors' employees.

The premiums under the insurance program with Blue Cross/Blue Shield of Minnesota are approximately $202,000 per month. As of the Petition Date, the Debtors were in arrears to Blue Cross/Blue Shield of Minnesota in the approximate amount of $505,000 Approximately 411 employees are covered by the Blue Cross/Blue Shield Plan. The Debtors are only seeking authority to pay these premiums to the extent necessary to ensure health coverage for the Debtors' employees.

### 2.  Dental Insurance.

The Debtors provide dental care coverage to their full time employees through a program provided by Delta Dental. The premiums under the Delta Dental program are $19,186 per month. As of the Petition Date, the Debtors were in arrears to Aetna in the approximate amount of $18,000. Approximately 480 employees are covered by the Delta Dental Plan.

### 3.  Vacation Pay.

The Debtors provide their full and part-time employees with vacation benefits. Over the years, the Debtors' employees have accrued vacation pay under a variety of legacy vacation policies, depending upon the entity (and in some cases predecessor entity) that employed the individuals. Under those programs, unused vacation pay could be banked for use in future years.

In January of 2006, the Debtors implemented a unified vacation policy for employees of all entities, based upon time worked, length of service, and job category (e.g., exempt, non-exempt, executive, etc.). This policy placed new limits on the ability of employees to carry forward unused vacation, but generally did not divest employees of vacation benefits earned under the prior programs.

As of the Petition Date, the Debtors' books and records indicate that their outstanding liability for accrued and unused paid vacation time was approximately $993,000, owing to 1,150 employees. Although the amount of vacation outstanding varies from employee to

employee, the average of this aggregate amount is about $863 per employee. Vacation continues to accrue as employees work, and it is used as employees take their vacation.

In the ordinary course of business, and as required by applicable law, the Debtors remit the cash value of accrued vacation benefits upon termination of an employee. In addition to honoring vacation benefits in the ordinary course (paying employees who take vacation postpetition), the Debtors seek authority to continue to pay their terminated employees their unused vacation, to the extent required by the Debtors' existing policies.

### 4. Workers' Compensation.

As required by applicable law, the Debtors maintain a workers' compensation benefit insurance policy for income protection, medical services, and rehabilitation services to employees with job-related injuries and illnesses. The program is administered by AIG, which pays claims under the guaranteed loss premiums of the policy. The monthly premium under these policies related to this program is approximately $128,000 subject to retrospective adjustment up or down based upon an audit of the Debtors' actual payroll amounts. As of the Petition Date, the Debtors were in arrears in the approximate amount of $128,000 for premiums due under this program.

### 5. Life Insurance/Disability/Employee Assistance.

In the ordinary course of business, the Debtors have provided group life insurance, disability insurance, and an employee assistance program (mental health) through programs with Jefferson Pilot Financial. The monthly costs of these programs are $2,458.92 for group life (covering 1173 employees), and $8,347 for disability (covering 732 employees). The employee assistance program is offered for free in connection with the other programs. Additionally, Jefferson Pilot Financial offers optional supplemental insurance, which funded from payroll deductions. As of the Petition Date, the Debtors were in arrears to Jefferson Pilot Financial in the approximate amount of $15,000.

### 6. 401(k) Plan.

The Debtors sponsor a 401(k) plan with a third party administrator, MetLife Financial. The Debtors make a matching contribution of 0.25% of each employee's

KLEE, TUCHIN, BOGDANOFF & STERN LLP
2121 AVENUE OF THE STARS, 33RD FLOOR
LOS ANGELES, CALIFORNIA 90067-5061
TELEPHONE: (310) 407-4000

contribution, up to a limit of 4%, at the time of each payroll. In addition, the Debtors incur administrative costs relating to the plan of approximately $45,881 per month. As of the Petition Date, the Debtors were in arrears to MetLife in the approximate amount of $55,000.

Also, the Debtors are sponsors of a 401(k) plan at Wells Fargo which is frozen, and is open for the limited purpose of administering loans that are outstanding to participants under that plan. The monthly cost of maintaining the Wells Fargo plan is approximately $1,598. As of the Petition Date, the Debtors did not owe any amount to Wells Fargo in connection with this program.

The Debtors seek authority, in the ordinary course of business and in accordance with their business judgment, to maintain these plans while employees continue to provide services, remit any and all payroll deductions made by employees to those plans, pay (in their sole discretion) any employer contribution with respect to those deductions, and to pay the costs of the plans while they are wound down in accordance with applicable law, following termination of the Debtors' operations.

### 7.    Flexible Benefits Plan.

The Debtors maintain a Section 125 flexible benefits plan that is available to qualified employees to fund medical and dependent care expenses. Individual flexible benefit accounts are funded voluntarily by employees through payroll deductions. The account is administered by a third-party administrator, the Flexible Benefits Group. The monthly administrative cost of this program is $810. As of the Petition Date, the Debtors were in arrears to Flexible Benefits Group in the approximate amount of $5,000. Additionally, there were approximately $5,000 in payroll deductions that had not yet been forwarded to the plan.

The Debtors seek authority herein, in the ordinary course of business and in accordance with their business judgment, to maintain this plan while employees continue to provide services, remit any and all payroll deductions made by employees to those plans, and to pay the costs of the plans while they are wound down in accordance with applicable law, following termination of the Debtors' operations.

### 8. Terminated ESOP.

The Debtors were sponsors of an employee stock option plan that previously was terminated. Nevertheless, the Debtors have been paying administrative fees to MetLife Financial with respect to the terminated plan due to the fact that certain loans from the plan remain outstanding and the wind-down of the plan is not complete. The monthly costs associated with this plan are approximately $545. As of the Petition Date, the Debtors did not owe any amount to Met Life Financial in connection with this program.

### 9. Other Benefits.

The Debtors provide their employees with other miscellaneous benefits, including paid holidays, jury–duty leave, and bereavement leave. The Debtors estimate that the annual cost of paying these other benefits, and the outstanding prepetition arrearages, if any, are negligible.

### E. The Need For Immediate Relief.

It is imperative that the Court grant the Debtors authority to honor prepetition employee compensation and employee benefit programs as outlined above. As noted the Debtors intend to wind down their operations in chapter 11. In order to do so in an orderly manner, however, they need the assistance of their remaining employees, interim employees and Service Partners over the coming weeks. These are the individuals with the knowledge, experience and familiarity with the business of the Debtors.

Unless the Debtors can promptly assure their employees and the Service Providers that they will meet their payroll, benefits and payment obligations on schedule, the remaining employees on which the Debtors are relying for support will resign precipitously, before the wind-down is completed. In this regard, the Debtors, in their business discretion, also may offer necessary employees that are not corporate officers or directors, incentive as a further inducement to remain with the Debtors. An amount from such payments is specified in the Budget and will be implemented by the Debtors in the course of the liquidation effort. If the Debtors do not succeed in retaining the employees they need to complete this process, it is more likely that packages will not reach their destinations and that claims against the

11

estate will correspondingly increase. The need, moreover, is immediate. The Debtors' wind-down is underway and will proceed promptly. Employees and Service Partners must be assured immediately that the Debtors have the authority to honor their compensation and benefits, or the opportunity to wind down the Debtors' operations in an orderly fashion will be irretrievably lost, and the estates irreparably harmed.

## II.

## ARGUMENT

### A.    Maintaining Wages Is Critical to the Success of The Debtors' Chapter 11 Case.

Numerous courts have recognized that a chapter 11 debtor must be able to maintain a stable employee base and harmonious employee relations if it is to successfully reorganize:

> [E]mployee good will and contentment is an asset which is vital to the continuation of a debtor's business operation and its ability to effectively reorganize during the Chapter 11 process . . . . In granting Debtors' applications for permission to provide hardship payments to injured workers, this Court determined that the uninterrupted payment of LTV Steel workers' compensation obligations is essential to employee morale and industrial tranquility which, in turn, are critical to a successful reorganization.

In re Chateaugay Corp., 116 B.R. 887, 898 (Bankr. S.D.N.Y. 1990) (citation omitted); see also In re Gulf Air, Inc., 112 B.R. 152, 154 (Bankr. W.D. La. 1989) ("[R]etention of skills, organization, and reputation . . . must be considered valuable assets contributing to going concern value and aiding rehabilitation."); cf. In re Interco, Inc., 128 B.R. 229, 230 (Bankr. E.D. Mo. 1991) ("In order to maintain and enhance the Debtors' estates during Chapter 11, continue a competitive operating status within highly competitive industries and confirm a successful reorganization plan, it is essential that the Debtors retain certain critical executives").

Here, although the Debtors intend to effect an orderly wind-down of their businesses, honoring prepetition employee wages and benefits is equally critical to the Debtors' efforts to maximize the value of its estates. For example, if the Debtors were unable to honor these benefits, there is a substantial risk that its employees would leave immediately, leaving the

Debtors' business in utter chaos and adversely impacting the Debtors' ability to conduct an orderly wind-down.

Moreover, if this chapter 11 filing disrupts the Debtors' ability to pay prepetition wages, commissions, and incentives, the Debtors' employees may suffer extreme personal hardship. In some cases, they may be unable to meet their living expenses. If the Debtors are not promptly authorized to meet their regular payroll obligations as they come due, the employees would be deprived of at least one week's wages and commissions and incentives. The negative impact on the Debtors' operation would certainly outweigh any *de minimis* savings that the Debtors and their creditors might realize if these wages and benefits were not offered going forward and if prepetition wages and benefits were not honored.

### B. Maintaining the Employee Benefit Programs Is in the Ordinary Course of The Debtors' Business.

Courts acknowledge that a debtor's relationship with its employees, including the terms and conditions of employment, are matters that are subject to the business judgment of the debtor and that may be managed by the debtor in the ordinary course of business. In considering a debtor's application to continue its prepetition compensation packages to various management personnel, one court provided the following analysis:

> The continued employment of existing management of a debtor-in-possession constitutes part of the operation of debtor's business and is within the ordinary course of business authorized by the Bankruptcy Code. Where post-petition operations are concerned, as long as it confines itself to operating within the ordinary course of business, a debtor-in-possession's actions are cloaked with an aura of propriety and, thus, the debtor is entitled to a presumption concerning the reasonableness of its decisions.

In re All Seasons Indus., Inc., 121 B.R. 822, 825 (Bankr. N.D. Ind. 1990) (citations omitted). Certainly, that which applies for management must apply with greater force for rank-and-file employees; see also In re Pac. Forest Indus., Inc., 95 B.R. 740, 743 (Bankr. C.D. Cal. 1989) ("Employees do not need court permission to be paid and are usually paid as part of the ongoing operation of the business."). Consonant with this decisional law, the Debtors' employee relations matters are within the ordinary course of business, and the maintenance

13

83925.1

of its normal employee benefits programs is in the ordinary course of its business.

Maintaining the benefit programs for employees is simply one facet, albeit an important facet, of the employer/employee relationship that is a matter within a debtor's business judgment and is presumptively to be handled in the ordinary course of business. The fact that the benefit programs were established prepetition does not render their postpetition maintenance any less in the ordinary course. Otherwise, debtors in possession would be required to seek court approval for virtually all aspects of their relationships with employees. This is precisely the result that Congress sought to avoid by enacting Bankruptcy Code sections 363(c)(1), 1107(a), and 1108. See 11 U.S.C. §§ 363(c)(1), 1107(a) & 1108; All Seasons Indus., 121 B.R. at 826 ("One of the major purposes for [the restructuring of the law under the Bankruptcy Code] was to remove the bankruptcy judge from the immediate supervision of the day-to-day aspects of the administration of an estate.").

### C.  Employee Compensation and Benefits Are A Cost of Winding Down The Debtors' Business Operations Postpetition.

The claims of an employee who provides postpetition services to a debtor in possession or a trustee in reliance upon certain benefits are likely entitled to administrative priority, notwithstanding that the criteria for measuring such benefits may have been based upon prepetition policies or actions. In re Pacific Far East Line, Inc., 713 F.2d 476 (9th Cir. 1983), a Ninth Circuit case, is instructive in this regard. In In Pacific Far East Line, the court ruled that employee benefit plan contributions that were due postpetition, but that were measured by prepetition hours of service, constituted administrative priority claims:

> The district court further concluded that the hours of pre-filing labor were not the consideration for the payments to the plan. Rather, the pre-filing hours were merely the units of measure for the post-filing payments, which were necessary for continued performance by both the employee and the employer under the collective bargaining agreement.
>
> . . . .
>
> In the last analysis, we observe that the result reached by the district court here serves Congress' intent to authorize administrative expense payments where third persons should be

83925.1

14

> encouraged to deal with the bankrupt estate, since these payments promoted continued performance under a labor agreement.

In re Pac. Far East Line, Inc., 713 F.2d at 479-80. The Ninth Circuit has also held that severance pay claims were entitled to administrative priority notwithstanding that the right to severance pay was set forth in a prepetition collective bargaining agreement that had been rejected. In re Tucson Yellow Cab Co., 789 F.2d 701 (9th Cir. 1986).

By similar reasoning, the entitlement of continuing employees to benefits such as paid vacation and to prepetition wages is part of the consideration due them for their continuing employment postpetition by the Debtors as debtors in possession. Any breach by the company as a debtor in possession could well give rise to administrative priority claims. As stated by one bankruptcy court:

> The purpose of an administrative priority remains the same as it was under the Bankruptcy Act: That is to induce third parties to supply the goods and services necessary to facilitate rehabilitation of the debtor's business. ... In the instant case, the employees' entire action in ratifying the Concessions Agreement and in working for the debtor-in-possession was based on the expectation of administrative priority in the event the debtor's rehabilitation effort failed. Thus, as a matter of statute, policy, and equity, the court was correct in finding that the Concessions Agreement serves as the basis for a Chapter 11 claim of administration . . . .

Illinois-California Express, Inc. v. Teamsters Nat'l Freight Indus. Negotiating Comm., 72 B.R. 987, 993 (D. Colo. 1987).

In the present case, those employees who continue to work for the Debtors are doing so based upon the belief that the Debtors will honor their existing obligations to employees. These obligations include the continued provision of benefits and uninterrupted payment of wages. To the extent relevant, the Debtors' failure to honor these obligations could give rise to administrative priority claims. Nothing herein, of course, constitutes an acknowledgment of any such liability. The Debtors' sole purpose in articulating these arguments and presenting these authorities is to make the point that ample authority supports the Debtors' business decision to maintain the benefit programs in the Debtors' sole discretion and in the

ordinary course of its business.

### D. Bankruptcy Section 507(a)(3) Grants Employees a Priority for Prepetition Wages.

Bankruptcy Code section 507(a)(3) grants employees a priority claim of up to $10,000 for prepetition wages earned within 180 days before the date of the filing of the petition. 11 U.S.C. § 507(a)(3). Even if an individual employee's actual entitlement exceeded $10,000 (which the Debtors do not believe is the case), such a circumstance ought not dissuade the Court from authorizing the Debtors to honor these claims in full. As one district court has observed, the priorities established by Bankruptcy Code section 507 should be interpreted flexibly so as to promote a debtor's successful reorganization. In re Chateaugay Corp., 80 B.R. 279, 287 (S.D.N.Y. 1987) ("A rigid application of the priorities of § 507 would be inconsistent with the fundamental purpose of reorganization and of the Act's grant of equity powers to bankruptcy courts, which is to create a flexible mechanism that will permit the greatest likelihood of survival of the debtor and payment of creditors in full or at least proportionately. . . In this case, a restrictive interpretation of § 507 would similarly defeat the very end of Chapter 11 petitions.") (citation omitted).

Indeed, courts often have permitted debtors to pay prepetition wage claims in the ordinary course of business in response to a motion filed by the debtor in possession at the very outset of the case. See COLLIER ON BANKRUPTCY ¶ 507.05[1] at 507-26 (15th ed. 2004). The relief requested is routinely granted in large and complex chapter 11 cases, such as these, that involve a large work force which is critical to the debtors' chapter 11 efforts. See, e.g., Burchinal v. Central Washington Bank (In re Adams Apple, Inc.), 829 F.2d 1484, 1490 (9th Cir. 1987) (courts have permitted the payment of employee prepetition debts when necessary for rehabilitation); In re Ionosphere Clubs, Inc., 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (sound business reason exists for paying employee prepetition claims where payment is necessary "to preserve and protect its business and ultimately reorganize, retain its currently working employees and maintain positive employee morale"); Chateaugay, 80 B.R. at 281 ("On the date of filing [of the chapter 11 petition], . . . Judge Lifland, upon

application of LTV, issued an order authorizing and empowering LTV to continue payment of prepetition wages and salaries, employee reimbursement expenses, and benefits. The aggregate value of the payments authorized was estimated to exceed $250 million.").

The Debtors can ill-afford to lose the services of its most valuable employees and contract workers during the difficult transition into chapter 11, especially in light of the fact that these employees' efforts will be critical in ensuring an orderly wind-down of the Debtors' operations in order to maximize value. By this Motion, the Debtors simply seek authorization to maintain employee wages and employee benefit programs and to pay prepetition wages, expenses, commissions and other compensation due and owing to its employees and workers in the ordinary course of business in its sole discretion and in the exercise of its business judgment, thereby preserving its ability to conduct an orderly wind-down of operations.

Finally, authorization of the payment of the employee obligations shall not be deemed to constitute postpetition assumption or adoption of any policy, plan, program, or employee agreement pursuant to section 365 of the Bankruptcy Code. The Debtors are in the process of reviewing these matters and reserve all of its rights under the Bankruptcy Code with respect thereto.

## III.

## CONCLUSION

Based upon all of the foregoing, the Debtors respectfully request that the Court grant the Motion.

DATED: March 16, 2006

MICHAEL L. TUCHIN
MARTIN R. BARASH
LAURA L. BUCHANAN
KLEE, TUCHIN, BOGDANOFF & STERN LLP
Proposed Reorganization Counsel for
Debtors and Debtors in Possession

83925.1

17